JOSEPH HESS *et als. v.* EDWARD WINDER *et als.*

MODE OF HOLDING A MINING CLAIM.—A mining claim on the public domain may
be held either by actual occupancy, and the exercise of control over it by dis-
tinctly indicating the boundaries by monuments and marks, or by occupancy in
accordance with the local mining customs.

MARKING BOUNDARIES OF MINING CLAIM.—One seeking to hold a mining claim by
virtue of prior possession alone, without any reference to local mining customs,
must mark out his boundaries by such distinct physical marks or monuments as
will indicate to any person what his exterior boundaries are.

ACTUAL OCCUPANCY OF PART OF A MINING CLAIM. — One who claims a tract of
mining ground for mining purposes on the public domain, but is actually occupy-
ing and working only one portion of it, cannot recover damages for an entry by a
stranger upon the tract beyond his actual occupancy, unless his boundaries were
plainly indicated by marks or monuments, or there was some local mining custom
allowing his possession to extend to the ground upon which the entry was made.

CONSTRUCTIVE POSSESSION OF A MINING CLAIM UNDER A DEED. — One who enters
upon a part of a mining claim under a deed, does not by the deed alone acquire
a constructive possession to the entire claim unless the deed contains definite and
certain boundaries which can be located, marked out, and made known from the
deed alone.

REFERENCE TO DOCUMENTARY EVIDENCE ON MOTION FOR A NEW TRIAL.—If a deed
is mentioned in a statement on motion for a new trial as having been in evidence,
but is not presented in the statement, the appellant may make it a part of the
record on appeal by printing it in the transcript, with a certificate of the Judge
that it is the deed referred to in the evidence, and that it was before him on motion
for a new trial.

APPEAL from the District Court, Tenth Judicial District,
Sierra County.

Plaintiffs recovered judgment in the Court below, and
defendants appealed both from the judgment and from an
order denying a new trial.

The other facts are stated in the opinion of the Court.

*Van Clief & Gear,* for Appellants, argued that to recover in
the action, the plaintiffs must have been in possession of that
part of the ground on which the defendants entered, and cited
*Frost* v. *Duncan,* 19 Barb. 560; *Budd* v. *Bingham,* 18 Barb.
494; and *Bigelow* v. *Gove,* 7 Cal. 133; and that as no custom
or mining regulations were offered in evidence which extended
plaintiffs' possession beyond their actual occupancy, they could
not recover, because they had never placed any monuments or
marks on their boundary lines where the same included the

ground worked out by defendants, and cited *English* v. *Johnson*, 17 Cal. 115.

*Creed Haymond*, and *J. A. Johnson*, for Respondents, argued that the evidence in regard to actual possession of plaintiffs was sufficient to warrant the verdict, and that under the rule that where the evidence was conflicting the Court would not grant a new trial on the ground that the evidence did not justify the verdict, the order denying a new trial should be affirmed.

They also argued that the entry under the Sheriff's deed was sufficient to give plaintiffs constructive possession of the whole claim, and cited *Attwood* v. *Fricot*, 17 Cal. 43.

By the Court, CURREY, C. J.:

This action was brought to recover damages for trespass *quare clausum fregit*, and also to obtain equitable relief by injunction against a continuance of trespasses of the character alleged in the complaint. Upon the issue joined between the parties, the plaintiffs' right and title to the *locus in quo* was the main fact litigated. The plaintiffs obtained a verdict for a small sum as damages and a special verdict to the effect that the land described in the complaint embodying the particular locality of the alleged trespass was the property of the plaintiffs at the time this action was commenced. Judgment was entered on the verdict, and in addition, the Court made a decree perpetually enjoining the defendants from entering upon and working in any manner the land, which was mining ground, described in the complaint. In due time after verdict, judgment and decree, the defendants moved for a new trial upon a statement prepared for the purpose. The application was denied and the defendants have appealed.

The error assigned by the defendants, when stated in general terms, is that the verdict was not in accordance with the evidence and wholly unwarranted by it; and that the Court erroneously refused to vacate and set it aside, with the judgment and decree that followed thereon.

It was proved on the trial that since October, 1863, and before this action was commenced, the defendants had worked upon, and from the mining ground described in the complaint, had taken and removed seven hundred or eight hundred square feet of gold bearing earth. To establish their right and title to the mining land thus entered upon, the plaintiffs produced witnesses to show that their right and title thereto had its inception in May, 1858, and had become perfected before the commission of the trespasses alleged. It does not appear that the location which the plaintiffs' grantors attempted to make was in accordance with any custom, rule or regulation of the miners of the district of country embracing the land in question. Therefore the plaintiffs' right to maintain their action necessarily depends upon other evidence than a location of the land on which the defendants entered, under and in pursuance of the customs, local laws and regulations of the miners of that district.

The plaintiffs claim that in May, 1858, one Stowell and eleven other persons, calling themselves the "American Company," posted a written notice on a certain fir tree, which was made the centre of their base or front line, by which they gave notice that they claimed a tract of land described as follows : Beginning at said fir tree, and thence running in a southwesterly direction five hundred feet; thence in a direct line to the summit of the main dividing ridge; thence up along the summit of said ridge one thousand feet; thence down the hill in a line parallel with the second mentioned course to a point five hundred feet in a northeasterly direction from said fir tree, and thence five hundred feet to the place of beginning. Early in the following June two of the company marked the corners at the extremes of the line forming the base of the area described, by blazing a tree at each of such corners, so that a line drawn from one of these corners to the other passed through the fir tree on which the notice was posted. Having marked these corners, they then attempted to measure from the initial point through the centre of the tract described to the summit of the main dividing ridge between Slate Creek

and Cañon Creek, but owing to impediments were unable to do so with accuracy. When they reached the summit of the ridge they blazed on a tree there, and wrote upon it the words: " Summit or back line of the American Company's Claims." The tree at the summit of the ridge was intended to designate the centre of the back line of the American Company's Claims as nearly as practicable. Before this measurement and location was made, the American Company, by one of its members, whose name was Stowell, applied to the members of the " Last Chance Company," a mining association claiming a tract of land lying to the south of the American Company's Claim, to designate the northeast corner of their claim at the dividing ridge, and was informed by them that their claim extended fifteen hundred feet in width up along the summit of the ridge, and they told Stowell to make the location of the American Company running to the northeast corner of the Last Chance Claim.

Two maps were produced in evidence, exhibiting the respective claims of these two companies, from which it appears that the tract of land claimed by the American Company extended from the fir tree, the initial point, eastward to the ridge nearly three thousand feet, with the Last Chance Company's Claim lying next to the south of it.

Sometime prior to December, 1859, the Last Chance Company changed its name to Golden Gate Company, and in the month last named this company, under their new name, made a survey of its land, and then for the first time marked and attempted to establish its northern boundary line, fixing its northeast corner on the summit of the dividing ridge about one hundred feet south of the blazed tree marked on behalf of the American Company at the back line on the dividing ridge. From this corner the Golden Gate Company ran its northerly line in a northwesterly direction parallel with the southern boundary line of the American Company's Claim as originally designated. While the Golden Gate Company was marking out its northerly line, the American Company complained that the former was taking a portion of the ground of

the latter; in answer to which the members of the Golden Gate Company replied that they would finish their survey and then determine whether or not they were taking any portion of the American Company's ground. After this survey was finished the Golden Gate Company conceded that this survey included a portion of the ground claimed by the American Company, and thereupon informed the last named company that the Golden Gate Company would throw off to it five hundred feet of the ground so surveyed, and that the American Company might survey or mark it off whenever. it pleased. Nothing more was done on the subject until July, 1860, when the American Company employed a surveyor by the name of Carter to make a survey of its ground and to definitely locate the line between the claims of the two companies. A survey was accordingly made, by which the American Company fixed the southwest corner of its claim at a point about eight hundred and seventy feet, as appears by one of the maps in evidence, easterly of the base line of the claim as originally established, and about three hundred and twenty feet north from its original southern boundary. From this corner the surveyor ran a line considerably south of east toward the dividing ridge between Slate and Cañon Creeks, fourteen hundred and eighty-five feet, to the "St. Louis road," marking trees and setting stakes on the line. He also set a stake on the line about one hundred and fifty feet beyond the road toward the dividing ridge. The northwest corner of the land now claimed by the American Company was marked by a stake at a point about eleven hundred and thirty feet northerly of the last named initial point. From this northwest corner a line was run toward the dividing ridge on a line parallel to the southern boundary of the same tract and distant therefrom one thousand and eighty feet, to a point very near to and east of the St. Louis road. This line to the extent it was run out was marked by monuments, the last of which was a blazed tree near and on the east side of the road. The base or front line of the Carter survey was also marked

45

by stakes and blazed trees. It does not appear that the lines
of the tract of land now claimed by the plaintiff were actu-
ally run by the surveyor beyond the monuments. near the St.
Louis road, on the east side of it, nor that the boundaries of
the land were otherwise marked by monuments than as already
stated, though the American Company directed him to survey
the side lines to the summit of the dividing ridge. That he
did not do so for want of time, affirmatively appears from the
statement. It is agreed by the parties that the dividing ridge
mentioned between the points where the side lines, if extended,
would reach the same, was well defined. It was in evidence
that it was Carter's usual custom in surveying a claim situated
as were those named, upon a hillside running back to the sum-
mit, to mark the front corners, and run a distance on each side
line, and to mark it, so as to sufficiently indicate the corners,
relying upon the summit of the hill as marking the back line,
and then to make a map of the survey, indicating by double
lines the part actually surveyed and marked by monuments,
and indicating the part not actually surveyed by dotted lines;
and that he had so made the survey and map produced on the
trial. At most the survey actually made and marked by monu-
ments embraced only the portion of land lying between the
base line on the west and a line drawn from the extreme east-
ern monument on one side line to that on the other side line,
near the St. Louis road, and between the parallel lines on the
north and south. The distance from the southwesterly corner
of Carter's survey along the south line run by him to the St.
Louis road is eighteen hundred and forty-five feet, and to the
monument standing on that line east of the road, one hundred
and fifty feet more, while the entire distance from the initial
point of Carter's survey to the dividing ridge is twenty-nine
hundred and fifty-seven feet. The distance represented by the
dotted line on the southern boundary as protracted is thirteen
hundred and twenty-two feet. The *locus in quo* is four hun-
dred and eighty feet east of the most eastern monument on
this southern boundary line, and six hundred and thirty feet
east of the St. Louis road. The northern boundary, as pro-

tracted from the blazed tree immediately east of said road, and which tree is the most eastern monument on that line, corresponds in character with the protracted boundary line on the south. These lines, it appears, were destitute of monuments necessary to indicate, in connection with the crest of the ridge, the tract of land which the American Company claimed as their mining grounds. There was nothing east of the St. Louis road which would have advised the most vigilant observer that the land between the protracted side lines of the American Company and the road and ridge was in the possession of the plaintiffs or any other private claimants.

*What constitutes possession of a mining claim.*

Where a party relies on prior possession as evidence of his right and title to land, he must establish by proof his occupancy of it or his dominion over it. Before the plaintiffs were entitled to recover, they were bound to show their right, as against the defendants, to the land entered upon. To show this, otherwise than by a paper title from some paramount source, it was incumbent on them to prove their prior possession or appropriation of it, in some mode which the law sanctions. Possession is presumptive evidence of title; but it must be actual. By actual possession is meant a subjection to the will and dominion of the claimant. (*Coryell* v. *Cain*, 16 Cal. 573.) In *English* v. *Johnson*, 17 Cal. 115, the Court recognizes a difference between the acts essential to indicate the possession and occupancy of agricultural land, and those necessary to show occupancy and dominion of a mining claim. The Court say: " We think when a claim is distinctly defined by physical marks, that possession taken for mining purposes embraces the whole claim thus characterized, though the actual occupancy or work done be only on or of a part, and though the party does not enter in accordance with mining rules or under a paper title." This authority not only recognizes but clearly indicates that the right to the possession of a particular piece of mining ground, on the Government domain, must be established by evidence of its appropriation by the

claimant by means which, in view of the nature of the subject
and of the surrounding circumstances, will give notice to
those who have a right to know that the particular mining
land is subjected to the dominion and control of some private
claimant. "Physical marks upon and around the claim," the
Court say, "are sufficient to notify every one of the possession
and claim of the possessor." But such physical marks must
be of sufficient prominence to be found by one honestly con-
cerned and diligently endeavoring to discover whether the
land is claimed by some other person for mining purposes.
While it has been the object and endeavor of the Courts of
this State to protect miners in the enjoyment of their mining
locations on the public lands, justice and policy, at the same
time, require some practical mode of notifying others of the
extent of their claims. What the mode shall be, and what
the extent of a mining claim may be, is generally regulated by
the miners of the particular locality, whose rules in this
respect are adopted as rules of law. But in the absence of
evidence of any such rules or of the custom of miners in the
particular district, we must apply the general rule governing
in such cases, which general rule, distinctly stated, is that the
boundaries of the land claimed for mining purposes must be
indicated by such distinct physical marks or monuments as
will fairly advertise to all concerned where and what it is, or
in other words its extent. The establishment of the base or
front of the plaintiffs' claim, and the running of the side lines
to a short distance east of the St. Louis road, and the marking
of trees and the erection of monuments to the extent the sur-
vey was made, could not have the effect to give to the plain-
tiffs or their grantors possession or the right to the possession
of the body of land lying between the lines of the surveyor
when protracted. It appears from the statement that the
American Company directed the surveyor to survey the side
lines to the summit of the ridge, which he failed to do, "for
want of time." This fact, in our judgment, is of no moment.
The fact is that no visible monuments or marks designating
the boundaries of the land were ever established beyond the

lines actually surveyed.   This being so, the American Company did not acquire possession or the right to possession of it.

### Constructive possession of a mining claim under a deed.

There is another ground on which the plaintiffs rely as establishing their right to the *locus in quo*, and on which they seek to support the judgment.   In 1861, a corporation called the " Indian Chief Company " acquired by purchase whatever right and interest the American Company had in the lands called the American Company's Claims.   At that time the Indian Chief Company entered upon the claim at or near the western portion of it as originally located, and in attempting to open and work the mine there, became involved in a large debt to Michael Canny.   For this debt the corporation at the request of Michael Canny made and delivered to Charles Canny a promissory note, and to secure its payment executed to him a mortgage on the same property.   This mortgage was foreclosed in the name of Charles Canny, and the property was sold by the Sheriff and purchased by the mortgagee, to whom a deed of it was made in August, 1863.   Charles Canny held the deed as trustee for Michael Canny, who entered into the possession of the property, claiming it of right as the *cestui que trust* of Charles Canny.   After this Michael Canny, who is one of the plaintiffs in this action, sold to his co-plaintiffs certain interests in the property.   The deed from the Sheriff to Charles Canny described the land sold in the foreclosure suit as all and singular that certain mining claim held, owned and in possession, on the 29th of July, 1862, of the Indian Chief Company, situate at Tregaski's Flat, known and designated as the Indian Chief Mining Company, and " bounded on the north by the Manzanita Claim, on the south by the Monte Christo Claims."   It is in evidence that Michael Canny had not obtained a deed from Charles.   In the opinion of the learned Judge denying the application for a new trial, he adverted to this circumstance, but held that in action of trespass the *cestui que trust* in possession is the proper plaintiff, and by misapprehending the language of the description

in the deed from the Sheriff to Charles Canny, he further held that the judgment should not be disturbed, because the plaintiffs were in possession under this deed, and that, having entered in good faith under color of title, and being in possession of a part of the land, they were in possession of the entire claim described in the deed, as against all persons except the true owner or prior occupant.

Assuming that Michael Canny and his co-plaintiff were in possession under the deed to Charles Canny, and had the right to maintain an action in all cases where they might, if the legal title under the Sheriff's deed had been in them, it is important to inquire whether the deed itself described with certainty any particular tract of land. The boundaries given are the Manzanita Claim on the north, and the Monte Christo Claims on the south. The boundaries of the claims referred to may have been of no greater extent than the north and south boundaries of the land intended to be described in the deed in question, and yet they may have been. If a party relies on a constructive possession by deed, he must show himself in the actual possession of a part of the land described in it, and the description must be definite and certain as to the boundaries of the land. If the deed contains no definite and certain boundaries, which can be located, marked out and made known, it cannot have the effect to extend the possession beyond the *possessio pedis,* which is definite, positive and notorious. (*Hicks* v. *Coleman,* 25 Cal. 134.)

The deed in question does not contain a description which could aid to extend the plaintiffs' possession by construction.

The plaintiffs, not having the possession or the right to the possession of the *locus in quo* at the time of the defendant's entry or subsequently, were not entitled to the judgment they obtained.

Judgment reversed and new trial ordered.

SHAFTER, J., and SAWYER, J., dissenting.

By the Court, CURREY, C. J., on petition for rehearing.

This case was passed upon by the Court at the last January term, and the judgment was reversed and a new trial ordered. Upon application, a rehearing was granted, and since then the cause has been re-argued by counsel for the respective parties.

It is objected, on behalf of respondents, that the Sheriff's deed referred to in the opinion of the Court heretofore delivered was not properly a part of the record in the case. It was not embodied in the statement settled and filed on the motions for a new trial, but it is annexed thereto by the appellants, accompanied by a certificate of the Judge who tried the cause and passed upon the motion for a new trial, as the Sheriff's deed to Charles Canny referred to in his opinion denying the motion for a new trial; which deed, he says, was before him on such motion, but was not referred to in the argument.

The statute provides that on the argument of a motion for a new trial, reference may be made to the pleadings, deposition and documentary evidence on file, and the minutes of the Court, as well as to the statement. (Prac. Act, Sec. 195.) In the statement reference is made to the Sheriff's deed, though it is not referred to as a part of the statement. In the opinion of the Judge denying the motion for a new trial, he refers to it in direct terms as evidence of the plaintiff's right to recover. It appears therefore that the deed constituted a part of the evidence upon which the cause was tried and upon which the Court acted on the hearing of the motion for a new trial. We are of the opinion it is properly in the transcript of the record.

We have re-examined the case upon its own merits, and see no reason for changing the opinion already delivered.

The judgment must be and is hereby reversed and a new trial ordered.

SHAFTER, J., and SAWYER, J., dissenting.